Kubit v. Brattleboro Mem'l Hosp., Inc., No. 363-7-10 Wmcv (Wesley, J., Aug. 4, 2011)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**WINDHAM COUNTY**

**RANDI KUBIT and**
**KENNETH KUBIT,**
     **Plaintiffs,**

                              **WINDHAM SUPERIOR COURT**
     **v.**                                **DOCKET NO. 363-7-10 Wmcv**

**BRATTLEBORO MEMORIAL HOSPITAL,**
**INC. a/k/a BRATTLEBORO MEMORIAL**
**HOSPITAL,**
     **Defendant.**

## ORDER ON DEFENDANT HOSPITAL'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Randi Kubit was injured when she slipped and fell while working as a nurse at Defendant Hospital, and she and her husband have sued the Hospital for negligence in maintaining the hospital premises. The Court has previously analyzed certain aspects of the claims and defenses of the parties in denying Plaintiff's motion to compel discovery by entry issued June 23, 2011. Currently pending is the Hospital's motion for summary judgment, in which it argues that it cannot be liable in tort because it was Randi's statutory employer at the time of the accident. The Court agrees, and therefore **GRANTS** the Hospital's motion for summary judgment.

*Background*

For purposes of this summary judgment motion, the Court views the evidence favorably to Plaintiffs, giving them the benefit of all reasonable doubts and inferences. See *Samplid Enterprises, Inc. v. First Vermont Bank,* 165 Vt. 22, 25 (1996).

Although Randi Kubit was working as a nurse at Defendant Hospital at the time of her fall, her actual employer was a company called Access Nurses, an agency which supplied nurses to work at the Hospital pursuant to a contract between Access Nurses and the Hospital. Randi is receiving workers' compensation benefits through Access Nurses.

The Hospital is a nonprofit institution that provides medical care and services to patients for a fee. In providing these services, the Hospital utilizes the services of numerous independent contractors. However, there is no suggestion that the Hospital actually contracts out the overall management of the hospital operation, or that the entity that operates the hospital is separate from the entity that owns the hospital premises.

Under the contract between the Hospital and Access Nurses, the nurses provided by Access Nurses were independent contractors rather than Hospital employees, and Access Nurses was required to, and did, provide workers' compensation insurance for them. Additionally, the contract between the Hospital and Access Nurses provided that Access Nurses would indemnify the Hospital against any claims asserted against the Hospital by third parties in connection with Access Nurses' performance of the contract.

*Analysis*

The Vermont Workers' Compensation Act defines the employment relationship more broadly than the common law, for purposes of establishing both an employer's obligation to pay benefits and the applicability of the exclusivity rule. See 21 V.S.A. § 601(3). Under this statutory definition of employer, the operator of a business is liable for workers' compensation benefits, and thus is not potentially liable in tort, for an injury to any worker carrying out any phase of the operator's regular course of business, even if the injured worker is directly employed by an independent contractor rather than by the

2

operator of the business. *Edson v. State of Vermont,* 2003 VT 32, ¶¶ 6-8. The test, referred to as the "nature-of-the-business" test, focuses on whether the work the employee did through the independent contractor is an integral part of, or process in, the business carried on by the operator. *In re Chatham Woods Holdings, LLC,* 2008 VT 70, ¶ 11 ("the purpose of this test is to impose liability on business owners who hire independent contractors to carry out some phase of their business").

Randi was injured while working as a nurse in a hospital, albeit as the direct employee of an independent contractor. Randi was providing care for a patient, and providing care for patients is exactly what hospitals do. Thus, at first blush, it seems apparent that this is exactly the kind of situation the statutory definition of employer was intended to cover. As will be seen, notwithstanding Plaintiff's efforts to argue otherwise, what seems to plainly follow from the authorities just discussed dictates the outcome of this ruling in favor of Defendant.

Nonetheless, Plaintiffs argue that material issues of fact remain regarding whether the statutory definition of employer applies here because: (1) the Hospital is a nonprofit institution, and nonprofits cannot be statutory employers; (2) the Hospital uses so many independent contractors that it should not be considered the operator of the hospital but instead should be considered the mere landlord of a "hub" in which others operate their various businesses; and (3) the Hospital cannot rely on the exclusivity provision of the Workers' Compensation Act because its contract with Access Nurses contained an indemnification clause.

*(1) Nonprofit Status*

Plaintiffs first argue that the Hospital cannot be a statutory employer because it is a nonprofit institution, and a nonprofit institution cannot be a statutory employer. In support of this argument, Plaintiffs cite a line of cases dating back to *Packett v. Moretown Creamery Co.,* 91 Vt. 97, 99 A. 638 (1917), in which the Court framed the statutory employer test to require the statutory employer to be operating a business for "pecuniary gain." See 99 A. at 640. Plaintiffs' argument suffers from several shortcomings, however.

First, a close reading of *Packett* shows that the "pecuniary gain" language is taken directly from an earlier version of the statutory definition of employment. See 99 A. at 639 ("The term 'employment' is defined, in the case of private employers, as including employment only in a trade or occupation which is carried on by the employer for the sake of pecuniary gain. Section 58(e)."). Not only does the present version of the statutory definition of employment omit this "pecuniary gain" language, but it contains language *explicitly including employment by nonprofit institutions.* See 21 V.S.A. § 601(4). It is true that the "pecuniary gain" language from *Packett* was picked up and quoted in a 1984 case, *King v. Snide,* 144 Vt. 395, 401-02 (1984), which was after the codification of workers compensation law changed and the "pecuniary gain" language was omitted. However, the outcome in *King* turned on the absence of any business being carried on at all, not on the absence of a profit-making motive for the claimed business. Thus, the "pecuniary gain" language in *King* in 1984 was essentially *dicta;* it does not appear again in any of the later cases involving statutory employment. The Court thus concludes that the "pecuniary gain" language referenced in *Packett* is of no present

4

effect in Vermont, much less that it prevents all nonprofits from being statutory employers.

Furthermore, even in Idaho, one of the few jurisdictions where the statutory provision defining employment still explicitly includes the "pecuniary gain" requirement, the Idaho Supreme Court has clarified that this "pecuniary gain" requirement does not turn on the non-profit status of the enterprise, and is satisfied if the business is providing goods or services in return for remuneration. See *Burrow v. Caldwell Treasure Valley Rodeo, Inc.,* 931 P.2d 1193, 1194 (Idaho 1997). Here, despite the Hospital's nonprofit status, it is in the business of providing health care services in return for remuneration. Thus, even if the Court assumed that a statutory employer in Vermont is required to be in business for "pecuniary gain," it would conclude that such a requirement would not categorically exclude all nonprofits and would not exclude the Hospital in this case.

It follows that Plaintiffs cannot avoid summary judgment on this ground.

*(2) Hospital is merely a landlord, not an operator*

Plaintiffs also contend that the Hospital uses so many independent contractors that it is no longer the operator of a hospital, but simply a landlord owning property where others provide medical care. The Court has already rejected this theory in its ruling denying Plaintiff's motion to compel disclosure of all Defendant's contracts with independent contractors in 2007; see Order on Plaintiffs' Motion to Compel issued June 23, 2011. No further analysis is necessary here. In essence, the Court concluded as a matter of law that use of a large number of independent contractors cannot alone give rise to a logical inference that the Hospital is not in fact operating the hospital.

5

*(3) Indemnification Agreement in Contract Between Hospital and Access Nurses*

Lastly, Plaintiffs cite *Hamelin v. Simpson Paper (Vermont) Co.,* 167 Vt. 17 (1997) and *Stamp Tech, Inc. v. Lydall/Thermal Acoustical, Inc.,* 2009 VT 91 to argue for "a limited exception to statutory employer immunity" where the direct employer and the statutory employer have entered into an indemnification agreement. Neither of these cases is remotely similar to this one, however, and they afford no support for Plaintiffs' position.

In *Hamelin,* a security company provided security services for a paper manufacturer under a contract providing that the security company would indemnify the paper manufacturer against any claims arising from its provision of security services. While patrolling, one of the security company's guards fell through some weak stairs on the paper manufacturer's premises. The injured guard collected workers' compensation benefits through the security company, and then sued the paper manufacturer for negligence in maintaining its premises. After notifying the security company and its insurer, the paper manufacturer settled the claim in good faith, leaving only the third-party claim by the paper manufacturer against the security company to enforce the indemnity clause. Thus, the decision in *Hamelin* was about the applicability and enforceability of the indemnification clause, and the arguments focused on (1) whether the parties intended the indemnification clause to cover an injured security worker's negligence-based claim, and (2) even if intended, whether it would violate public policy to allow indemnification against a claim based on the indemnitee's own negligence under these circumstances. See 167 Vt. at 18-20. Whether the paper company was the security

6

guard's statutory employer was not raised or discussed at all; and it clearly was not a statutory employer, since the paper manufacturer was not in the security business.[1]

Like *Hamelin, Stamp Tech* was not about statutory employer immunity, but was instead about the enforceability of a contractual indemnification clause. In *Stamp Tech,* a contractor was hired by a manufacturing plant to install safety devices on an industrial press, pursuant to a contract in which the manufacturing plant agreed to indemnify the contractor against any claims arising from performance of the contract. An injured worker had sued the contractor for negligence, and following notice to the manufacturing plant, the contractor settled with the worker. The contractor was judgment proof, and in return for the employee's agreement not to press his claim against it, it assigned its indemnification claim against the manufacturing plant to the employee. The employee then sought to collect from the manufacturing plant, his employer, based primarily on the indemnification clause. The trial court felt the settlement with the judgment proof contractor was collusive, concluded as a matter of law that there was insufficient proof that the contractor was at fault, and granted the manufacturing plant/employer's motion for summary judgment on the indemnification claim. 2009 VT 91, ¶ 8. The Supreme Court reversed, ruling that questions of fact relevant to the good faith of the settlement and the contractor's fault remained. *Id.* at ¶¶ 1, 14-17. It is apparent from this summary that no one in *Stamp Tech* is even arguably a statutory employer. It is true that there was a second issue involving a claim by the worker that the exclusivity provision should not

---

[1] The closest *Hamelin* came to peripherally touching on the statutory-employer issue was a brief reference to another contract term in which the parties had tried to provide employer immunity to the paper manufacturer by deeming the guards its "special employees." See 167 Vt. at 20. The security company had unsuccessfully suggested that the inclusion of this term made the parties' intent that the indemnification clause cover injured workers' claims ambiguous, see *id.,* but there was no explicit argument or discussion regarding whether the paper company was the security guard's statutory employer, or any effect that determination might have had on the analysis.

7

apply because the employer's wrongdoing rose to the level of an intentional tort, but this exception based on intent clearly has no pertinence here.

Thus, these cases do not support an exception to statutory employer immunity where the direct employer and the statutory employer have entered into an indemnity agreement. Such an exception is neither logical or reasonable, as a contract between the two potentially liable employers can only establish rights and obligations with respect to each other, not with respect to injured workers, which are governed by law.

### *Summary and Conclusion*

The Hospital is in the business of providing care to patients. Randi Kubit was working at the Hospital as a nurse, providing care to patients, through an independent contractor hired by the Hospital. This is exactly the type of situation the statutory employer provision was intended to cover, and Plaintiffs' arguments for not applying the exclusivity rule here fail as a matter of law. The Court therefore concludes that no issues of material fact remain, and the Hospital is entitled to summary judgment.

### **ORDER**

**WHEREFORE** it is hereby **ORDERED:** The Hospital's motion for summary judgment is **GRANTED.**

Dated at Newfane, Vermont, this _____ day of August, 2011.

_____
John P. Wesley
Presiding Judge

8